**SCHLEIER LAW OFFICES, P.C.**
3101 N. Central Avenue
Suite 1090
Phoenix, Arizona 85012
Telephone: (602) 277-0157
Facsimile: (602) 230-9250

TOD F. SCHLEIER, ESQ. #004612
Tod@SchleierLaw.com
BRADLEY H. SCHLEIER, ESQ. #011696
Brad@SchleierLaw.com

*Attorneys for Plaintiff Brieanna Murphy*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Brieanna Murphy, a married woman, | ) |
| Plaintiff, | ) No. |
| v. | ) **COMPLAINT** |
| Draeger, Inc. a Delaware Corporation, | ) **(Demand for Jury Trial)** |
| Defendant. | ) |

Plaintiff Brieanna Murphy, for her Complaint against Draeger, Inc. alleges as follows:

**JURISDICTION AND VENUE**

1. The jurisdiction of this Court is invoked pursuant the Court's federal question jurisdiction as set forth in 28 U.S.C. §1331, the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12111 *et seq.*, the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("Title VII"), the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, *et seq.*, and FMLA's anti-retaliation provisions, 29 U.S.C. §2615(a)(2).

2. The complained upon actions were committed against Plaintiff while residing in Maricopa County, State of Arizona by Defendant who employed Plaintiff in Arizona and does business in Arizona. Accordingly, venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

3. Plaintiff Brieanna Murphy ("Plaintiff" or "Murphy") resides in Maricopa County, Arizona, and is a married woman.

4. Plaintiff Murphy was an "employee" of Defendant Draeger within the meaning of the ADA, Title VII, and the FMLA at all times material to this action.

5. Defendant Draeger ("Defendant" or "Draeger") is a Delaware Corporation doing business in the State of Arizona. For the purposes of the ADA, Title VII, and the FMLA, Defendant Draeger was the "employer" of Plaintiff.

**BACKGROUND**

6. Plaintiff Murphy was employed with Draeger, Inc. from 2012 up to her apparent termination on January 19, 2018.

7. Throughout her employment with Draeger, Ms. Murphy demonstrated good work performance and at no time prior to her termination had Ms. Murphy been made aware of any performance issues or placed on any type of performance plan. Ms. Murphy excelled in her job from 2012 through 2017 and consistently received positive recognition, and increased commissions based on her sales achievements.

8. At the time of her termination Ms. Murphy held the position of a Federal Government Account Manager.

9. As a Federal Government Manager, Ms. Murphy demonstrated various safety equipment to military and federal government agencies including gas detection equipment, and self-contained breathing apparatus (SCBA) devices/tanks worn by rescue workers, firefighters and diving equipment for Navy seals.

10. Ms. Murphy traveled with the equipment she demonstrated which weighed in excess of 50 pounds and she would load and unload the equipment in and out of airplanes, cars, up and down stairs, and setup and breakdown after demonstrations.

11. In late April 2017, Ms. Murphy experienced certain medical issues related to her epilepsy condition and kidney function and was placed on "travel restrictions" due to these disabilities. Nonetheless, Ms. Murphy continued to work full-time and successfully performed her duties by phone, email, and computer communications.

12. On about May 14, 2017, Ms. Murphy learned she was pregnant and by about June 21, 2017, she was also diagnosed with a medical condition that threatened her pregnancy.

13. Ms. Murphy had a long history of disabling pregnancy complications and when combined with her epilepsy resulted in pre-term labor and miscarriages that required long-term medical care and constitute a disability.

14. Ms. Murphy informed her manager, Mr. Robert Miller and Ms. Nora Diettrich, from Human Resources about her high-risk pregnancy and that she had an anticipated due date in February 2018. Also, due to Ms. Murphy experiencing disabling pregnancy complications, she was also placed on "lifting restrictions" of 10 pounds and intermittent bed rest in an attempt to prevent a miscarriage.

15. By about August 10, 2017, Ms. Diettrich informed Ms. Murphy that Draeger would no longer accommodate Ms. Murphy's travel restrictions and Murphy was advised to take FMLA and Short-Term Disability (STD) medical leave. Ms. Diettrich also assured Ms. Murphy that her job would be held for one year.

16. Defendant's leave and disability programs were handled by Prudential.

17. The next day on August 11, 2017, Ms. Murphy had a phone conversation with her manager Mr. Miller, and he acknowledged Ms. Murphy's medical leave and told Ms. Murphy that he would cover her duties during her leave. Mr. Miller also assured Ms.

Murphy that her job would be held for one year and explained that he was not allowed to discuss work matters with Ms. Murphy while she was on medical leave.

18. Ms. Diettrich did not again reach out to Ms. Murphy until mid-October 2017 wherein they had a casual phone conversation and that Ms. Diettrich was "checking-in," and they discussed Ms. Murphy's pregnancy, complications as well as the continued travel and lifting restrictions.

19. On about November 2, 2017, during one of their phone calls, Ms. Diettrich discussed with Ms. Murphy the expiration of her STD leave on or about November 13, 2017 and the need for Ms. Murphy to take Long-Term Disability (LTD) medical leave.

20. Ms. Murphy again discussed her anticipated baby due date of February 2018 and also explained that even though she was restricted from travel and heavy lifting that Ms. Murphy was not restricted from phone and computer work and could work. Ms. Diettrich advised Ms. Murphy that staying on LTD was best until after the birth of her son.

21. Ms. Diettrich and Ms. Murphy discussed Ms. Murphy's plan to return to work full-time in her previous role as soon as Ms. Murphy recovered from the delivery of her son.

22. Ms. Murphy's LTD medical leave was approved through the duration of her pregnancy and up to eight weeks after the birth of her child for recovery, barring no complications.

23. Draeger and Prudential were well aware that Ms. Murphy was on extended medical leave with an anticipated baby due date in February 2018, approved six to eight weeks of recovery time up through March or April 2018, and aware of Ms. Murphy's anticipated return to work thereafter.

24. Ms. Murphy continued her communications with Ms. Diettrich, even though she was not aware of any necessity to speak with her since her medical leave was being administered by Prudential.

25. Ms. Murphy was only required to communicate with her employer when she had her doctor's release with a definite return to work date which was six to eight weeks after the recovery of her baby's birth. Otherwise Ms. Murphy was only required to continue her communicates with Prudential.

26. On November 20, 2017, for some unknown reason Ms. Diettrich left another message for Ms. Murphy, even though Ms. Murphy had just recently talked with her.

27. Ms. Murphy did not immediately call back due to her experiencing medical issues which hindered her ability to return the call which was followed by the Thanksgiving weekend.

28. On about November 23, 2017, the Monday after the holiday weekend, Ms. Murphy was admitted into the hospital for pre-term labor symptoms and once stabilized she was released from further hospital care.

29. Ms. Murphy tried to call Ms. Diettrich back in early December 2017 but was only able to leave a message. On December 12th, Ms. Diettrich called and left Ms. Murphy a message wondering how Ms. Murphy was doing and acknowledged they were playing a bit of phone tag.

30. Within fifteen minutes of the December 12th call, Ms. Murphy called Ms. Diettrich back and again was only able to leave another message for Ms. Diettrich. Ms. Murphy had no other communication with Ms. Diettrich until after she was terminated.

31. Ms. Murphy loved her job and also stayed in touch with her work team. In fact, on about December 13, 2017, Ms. Murphy exchanged text messages with her team during a team meeting and she was sent a picture of her team hugging each other, and comments were made to her that they were expecting her back.

32. Unexpectedly, Ms. Murphy also learned that Draeger had hired Mr. Chris Fairchild, a non-disabled, less-qualified male for her team who was given a start date in January 2018.

33. Soon after, Ms. Murphy also learned that Draeger had hired another non-disabled, less-qualified male for her team also starting in January 2018.

34. With the addition of the two males Ms. Murphy's team, there was a total of total of five men on her team with Ms. Murphy as the only female on that team as well as the only female outside salesperson out of about 100 male salespeople in the entire safety division.

35. On December 28, 2017, and again on January 11, 2018, Ms. Murphy experienced pregnancy complications and was hospitalized for pre-term labor symptoms. Ms. Murphy was released from further hospital care once her condition was stabilized.

36. On January 26, 2018, Ms. Murphy was no longer able to log on to her Draeger's benefits and emailed Draeger's benefits coordinator.

37. On January 29, 2018, the benefits coordinator replied to Ms. Murphy's inquiry and Ms. Murphy was shocked to learn her employment had been terminated as of January 19, 2018, due to Draeger's claim of "job abandonment" while Ms. Murphy was still pregnant and on approved medical leave.

38. Ms. Murphy was also informed that her benefits would expire on January 31, 2018 due to her termination, which ultimately expired two days before her son was born. Ms. Murphy immediately emailed her manager, Mr. Miller, inquiring about her termination.

39. Ms. Murphy was in disbelief of her termination and had no reason to expect being terminated as she had not received any indication that her job was in jeopardy either by phone call, email or written notification.

40. Ms. Murphy also learned that Ms. Nora Diettrich claimed she sent Ms. Murphy two overnight letters on December 22, 2017 and January 12, 2018, requesting Ms. Murphy contact Ms. Diettrich and that Ms. Murphy was terminated for not responding to Ms. Diettrich's letters and abandoning her job.

41. Ms. Diettrich made this claim even though she was well aware that Ms. Murphy was on LTD leave, the expected delivery date of her child, the approximate date of her return to work which was six to eight weeks after the birth of her child, and that her LTD payments were being administered by Prudential. It was beyond comprehension and reasoning as to why Ms. Diettrich continued to stay in contact with Ms. Murphy and that any such contact was a necessity.

42. When Ms. Murphy contacted Ms. Diettrich, Ms. Murphy reiterated that she in fact had been communicating Ms. Diettrich by phone throughout Ms. Murphy's medical leave, that Ms. Diettrich was well aware of Ms. Murphy's due date in February 2018, that she was on approved LTD medical leave, and that Ms. Murphy was returning to work after the recovery period.

43. Ms. Murphy explained to Ms. Diettrich that neither Ms. Murphy nor anyone known to Ms. Murphy had ever signed for or received either of Ms. Diettrich's alleged letters.

44. Most notably, when Ms. Murphy requested proof of receipt of the letters, Ms. Diettrich could not provide any proof of receipt for her December 2017 letter, and only provided a receipt for a signor receiving the January 2018 letter, who was not Ms. Murphy or anyone who neither Ms. Murphy nor her husband knew.

45. Ms. Murphy explained that she did not receive either of Ms. Diettrich's letters.

46. On January 30, 2018, Ms. Diettrich exchanged several emails with Ms. Murphy regarding Ms. Murphy's termination and requesting Ms. Murphy return Draeger's equipment which was heavy, and Ms. Diettrich was also aware that by this point Ms. Murphy was about nine months pregnant with lifting restrictions.

47. Ms. Murphy was hospitalized on January 31, 2018 and again on February 2, 2018 due to pre-term labor symptoms, and ultimately delivered her baby on February 2, 2018.

48. Ms. Murphy notified Prudential of her son's birth by February 7, 2018 and on February 16, 2018 confirmed Ms. Murphy's LTD medical leave expired by March 16, 2018.

49. Ms. Diettrich again emailed Ms. Murphy on February 13, 2018 demanding return of Draeger's equipment. Draeger's legal representative also emailed Ms. Murphy on February 27, 2018 and then again on April 10, 2018 also demanding return of Draeger's equipment, which was ultimately returned.

50. Ultimately, Draeger never took any action to correct its mistake when it illegally terminated Ms. Murphy as of January 19, 2018, while pregnant and on approved medical leave for her disability and pregnancy.

51. The timing of Draeger's December 2017 hiring and adding of two non-disabled, less-qualified males to Ms. Murphy's team was also suspect as her team was now all-male.

**COUNT ONE**

**(VIOLATION OF THE FMLA)**

52. By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

53. Defendant is an employer as defined by the FMLA. 29 U.S.C. § 2611(4)(A) and obligated to conform with the FMLA as it relates to Plaintiff's medical care.

54. Plaintiff is a covered employee under the FMLA.

55. Plaintiff was forced to take protected FMLA qualifying leave due to her disability and pregnancy.

56. The FMLA guarantees that an employee taking leave will not result in the loss of job security or other adverse employment actions.

57. The FMLA provides job security and leave entitlements for employees who need to take absences from work for personal medical reasons, to care for their newborn babies, or to care for family members for serious illnesses.

58. Defendant retaliated against Plaintiff in violation for her use of FMLA leave for the personal care related to her pregnancy and related medical complications.

59. Defendant harassed Plaintiff seeking information relating to her medical condition while her medical issues were being administered by third party administrator.

60. Defendant's actions resulted in the loss of job security in light of the Company policy to provide for up to a year of leave for medical issues, deprived her of said benefit, and terminated her employment in retaliation for her using protected leave under the FMLA.

61. As a direct and proximate result of Defendant's retaliatory actions, Plaintiff has suffered and continues to suffer economic damages in the form of lost wages and the value of job benefits.

62. Defendant acted willfully in their violation of the FMLA in retaliating against Plaintiff thereby entitling her to a doubling of the damages set forth above as liquidated damages as authorized by 29 U.S.C. § 2617(a)(1).

63. Plaintiff is entitled to an award of attorneys' fees incurred in pursuing her claims under the FMLA.

**COUNT TWO**

**(VIOLATION OF THE ADA)**

64. By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

65. Plaintiff was a disabled employee and or regarded as having a disability within the meaning of the ADA and entitled to certain job benefits including the ability to retain her position for up to one year per company policy.

66. The termination of Plaintiff was due to her disability or the fact that Defendant regarded Plaintiff as being disabled.

67. That non-disabled, similarly-situated employees of Defendant engaged were provided job protections and were not terminated while on protected leave or company leave.

68. Additionally, Defendant hired two male, non-disabled employees to replace Plaintiff.

69. The reason for Plaintiff's termination was merely a pretext and the decision to terminate Plaintiff was due to her disabilities.

70. Plaintiff's termination was motivated by her disability and violated the ADA.

71. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has sustained and continues to sustain damages in the form of lost wages and value of benefits.

72. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, a loss of self-esteem, and a permanent scar in her employment history.

73. Defendant's conduct is willful and is a dereliction of Plaintiff's federally protected rights, thereby entitling Plaintiff to punitive damages.

**COUNT THREE**

**(VIOLATION OF TITLE VII-SEX/PREGNANCY DISCRIMINATION)**

74. By reference hereto, Plaintiff incorporates all prior paragraphs as if fully alleged herein.

75. Under Title VII, it is unlawful for an employer to discriminate against the terms and conditions of employment of its employees.

76. Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex and pregnancy in violation of Title VII as a result of terminating Plaintiff while on leave protected by law and company policy.

77. Plaintiff was replaced by two non-pregnant males.

78. Defendant's reasons for Plaintiff's termination were false and merely a pretext for discrimination.

79. Defendant's termination was motivated by her sex/pregnancy and was a violation of Title VII's prohibition of sex and/or pregnancy discrimination.

80. As a direct result of the sex/pregnancy discrimination referenced herein, Plaintiff has suffered lost wages and the value of benefits.

81. As a direct result of the sex/pregnancy discrimination, Plaintiff has sustained emotional distress, including but not limited to loss of reputation, loss of profession, and emotional pain, suffering, and humiliation.

82. The actions of Defendant were done in reckless indifference to Plaintiff's federally protected rights and Plaintiff is therefore entitled to recover punitive and exemplary damages.

**WHEREFORE**, Plaintiff requests that the Court enter Judgment against Defendant, individually and jointly, as follows:

1. For Special and General damages to be proven at trial;
2. Compensatory damages to be proven at trial;
3. An award of liquidated damages as provided under the FMLA;
4. Punitive and/or exemplary damages;
5. Attorney's fees;
6. Costs of suit;

7. Prejudgment and post-judgment interest; and

8. For such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

DATED this 4th day of March 2019.

SCHLEIER LAW OFFICES, P.C.

/s/ Bradley H. Schleier
Bradley H. Schleier
3101 North Central Ave., Suite 1090
Phoenix, Arizona 85012
*Attorneys for Plaintiff Brieanna Murphy*